Wanamaker, J.
But one question is presented by the record in this case and that is the constitutionality of an ordinance of the city of Xenia, the essential parts of which are as follows:
“It shall be unlawful for any person or persons, corporation or corporations, or any agent or employee thereof, to place or deposit, or cause to be placed or deposited upon any street, alley, sidewalk, public highway or public grounds of this city, any *439 wood, coal, box, barrel, crate, cask, keg, casting, lumber, goods, wares, furniture, merchandise, or any other material or obstruction whatsoever, unless for such reasonable time as may be actually necessary for receiving or discharging the same from some store, building or other place, and in such event the same shall be so placed as not to- block the street, alley, sidewalk, public highway or public grounds upon which the same is so placed, or to interfere with the free passage of water in the gutters of such street, alley or public highway. Provided : That the provisions of this section shall not apply to nor affect any permanent steps or approaches to buildings already abutting on any street, nor any balcony, bay-window, or column of any building already abutting on any street.”
A test case of the constitutionality of the ordinance was made by way of affidavit in the police court of the city of Xenia.
Upon trial in that court defendant in error, H. E. Schmidt, was found guilty of a violation of the ordinance. The defendant in error in every available way protested against the constitutionality of said ordinance and fully saved his rights for a review of his conviction in the court of common pleas.
In the latter court the judgment of the police court of the city of Xenia was reversed upon the sole ground that the ordinance in question was unconstitutional.
The city of Xenia'prosecuted error in the court of appeals, to reverse the judgment of the court of common pleas and affirm the judgment of the police court. The court of appeals affirmed the judgment *440 below, and the city of Xenia prosecutes error to this court.
The judgments of the court of common pleas and the court of appeals are both founded upon the following part of the ordinance above quoted, as a constitutional infirmity that is fatal to the validity of the ordinance:
“Provided: That the provisions of this section shall not apply to nor affect any permanent steps or approaches to buildings already abutting on any street, nor any balcony, bay-window, or column of any building already abutting on any street.”
Whether or not the ordinance in question is wise or unwise is clearly without our jurisdiction, and clearly within the jurisdiction of the municipal legislative body of the city of Xenia. Whether or not the ordinance is constitutional or unconstitutional is clearly within our jurisdiction, and this constitutional question is the only one considered in this cause, wholly apart from the identity of the parties, and solely as a question of an exercise of municipal power under the Constitution of Ohio.
In the early days of the American state and nation it was an open question whether or not the constitutionality of a legislative act was or was not wholly within the jurisdiction of the legislative body. It was so under the common law of England, from which we had inherited the principles of our American jurisprudence. The English parliament was supreme — exempt not only from judicial supervision, but had been exempt from the royal veto for a century. The sovereignty of England, the mother country, had been in its legislature. In some states, *441 at an early date, the power of judicial review of constitutional questions had been vigorously asserted ; in other states it had been vigorously denied. Finally, in 1803, there was decided in the United States supreme court the case of Marbury v. Madison, 1 Cranch, 135, in which the syllabus holds: “An act of Congress repugnant to the constitution is not law.”
But who shall decide whether it is in conflict? That question is answered in the opinion by Marshall, C. J., which has become the foundation of the unique and distinctive American doctrine of constitutional law, and may be fairly designated as the new “Marshall Law.” The doctrine and reasoning supporting it are briefly as follows:
“The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written. To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained ? The distinction between a government with limited and unlimited powers is abolished, if those limits do not confine the persons on whom they are imposed, and if acts prohibited and acts allowed, are of equal obligation. It is a proposition too plain to be contested, that the constitution controls any legislative act repugnant to it; or, that the legislature may alter the constitution by an ordinary act. * * *
“Certainly all those who have framed written constitutions contemplate them as forming the fundamental and paramount law of the nation, and, *442 consequently, the theory of every such government must be, that an act of the legislature, repugnant to the constitution, is void. * * *
“Those, then, who controvert the principle that the constitution is to be considered, in court, as a paramount law, are reduced to the necessity of maintaining that courts must close their eyes on the constitution, and see only the law.
“This doctrine would subvert the very foundation of all written constitutions. It would declare that an act which, according to the principles and theory of our government, is entirely void, is yet, in practice, completely obligatory. It would declare that if the legislature shall do what is expressly forbidden, such act, notwithstanding the express prohibition, is in reality effectual. It would be giving to the legislature a practical and real omnipotence, with the same breath which professes to restrict their powers within narrow limits. It' is prescribing limits, and declaring that those limits may be passed at pleasure.
“That it thus reduces to nothing what we have deemed the greatest improvement on political institutions, a written constitution, would of itself be sufficient, in America, where written constitutions have been viewed with so much reverence, for rejecting the construction.'”
This doctrine, if not wholly approved in all jurisdictions, has been so long acquiesced in that it has now become a settled part of our jurisprudence. The nature of this conflict or extent of the conflict is not discussed in the Marbury case, but was shortly afterwards fully considered in the case of *443 Fletcher v. Peck, 6 Cranch, 87, decided in 1810. The opinion by Marshall, C. J., contains the following language:
“The question, whether a law be void for its repugnancy to the constitution, is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station, could it be unmindful of the solemn obligations which that station imposes. But it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other.”
In Admrs. of Byrne v. Admrs. of Stewart, 3 Desaus. Eq., 466, decided in 1812, Chancellor Waties had reviewed the decisions to date, stale and federal, and closes an elaborate opinion with the following language at page 477:
“The validity of a law ought not, then, to be questioned, unless it is so obviously repugnant to the constitution, that when pointed out by the Judges, all men of sense and reflection in the community may perceive the repugnancy. By such a cautious exercise of this judicial check, no jealousy of it will be excited, the public confidence in it will be promoted, and its salutary effects be justly and fully appreciated.”
This doctrine is supported by Cooley in his work on Constitutional Limitations (7 ed.), 252. In *444 Ogden v. Saunders, 12 Wheat., 213 (1827), Justice Washington, after remarking that the question was a doubtful one, said at page 270:
“If I could rest my opinion in favor of the constitutionality of the law * * * on no other ground than this doubt so felt and acknowledged, that alone would, in my estimation, be a satisfactory vindication of it. It is but a decent respect due to the wisdom, the integrity, and the patriotism of the legislative body by which any law is passed, to presume in favor of its validity, until its violation of the constitution is proved beyond all reasonable doubt. This has always been the language of this court, when that subject has called for its decision; and I know that it expresses the honest sentiments of each and every member of this bench.”
In a later decision, in the Sinking-Fund Cases, 99 U. S., 700 (1878), Chief Justice Waite, speaking for the court, said at page 718:
“This declaration [that an act of congress is unconstitutional] should never be made except in a clear case. Every possible presumption is in favor of the validity of a statute, and this continues until the contrary is shown beyond a rational doubt. One branch of the government cannot encroach on the domain of another without danger. The safety of our institutions depends in no small degree on a strict observance of this salutary rule.”
The great Chief Justice Shaw, in Wellington et al., Petitioners, 16 Pick., 87 (1834), speaking for the Massachusetts supreme court, said, at page 95, that it was proper “to repeat what has been so often suggested by courts of justice, that when called *445 upon to pronounce the invalidity of an act of legislation * * * [they will] never declare a statute void, unless the nullity and invalidity of the act are placed, in their judgment, beyond reasonable doubt.”
To the same effect are the able decisions of Justice Bigelow in Commonwealth v. The People’s Five Cents Sav. Bk., 5 Allen (87 Mass.), 428; Justice Savage, in Ex Parte M’Collum, 1 Cow., 550, 564; Justice Harris, in The People, ex rel. Burrows, v. Supervisors of Orange County, 17 N. Y., 235, and many others.
Probably no ease in Ohio has attracted more attention upon this question as to the measure of conflict and the clearness and certainty with which it must appear before the invalidity may be declared by the court than Cincinnati, Wilmington & Zanesville Rd. Co. v. Clinton County Commissioners, 1 Ohio St., 77, in which Justice Ranney, speaking for the court, said at page 82:
“But while the right and duty of interference in a proper case, are thus undeniably clear, the principles by which a court should be guided, in such an inquiry, are equally clear, both upon principle and authority * * * and it is only when manifest assumption of authority, and clear incompatibility between the constitution and the law appear, that the judicial power can refuse to execute it. Such interference can never be permitted in a doubtful case. And this results from the very nature of the question involved in the inquiry. * * *
“The adjudged cases speak a uniform language upon this subject. * * *
*446 “An unbroken chain of decisions to the same effect, is to be found in the State courts.”
Is there here that “clear,” “irreconcilable” conflict, that conflict beyond all reasonable doubt, between the ordinance in question and the Constitu ■ tion of Ohio or of the United States ? If so, it must appear by reason of the attempted classification or exemption made by the ordinance.
The question, bared to the bone, is, Does the proviso clearly conflict with any provision of our state constitution ? The court of common pleas and the court of appeals have both found that it does so conflict. The court of common pleas in its opinion uses the following language:
“The court thinks that that ordinance is invalid because of the fact that the municipal authorities had attempted to differentiate as between obstructions of the streets and sidewalks, leaving certain ones and excluding others.”
And further:
“But when it comes to enact legislation — fundamental law of the city — they cannot differentiate as between individuals in that city and say ‘certain ones shall not obstruct that street in a certain way, and certain others may in a certain way.’ That is exactly what the municipal authorities had attempted to do in this section.”
The court of appeals, in its opinion, says:
“The exemptions from the provisions of the ordinance in question consist of permanent obstructions, while the ordinance attempts to include within its provisions temporary obstructions. We are unable to see any good reason for including tem *447 porai'y obstructions and at the same time excluding many obstructions of a permanent nature.”
Clearly the passage of the ordinance involves the police power, which power in the affairs of government has dimensions equal to the public needs and embraces for the most part practically all of the sovereign powers of government. All other powers, such as taxation, eminent domain, and the like, are after all only incidental and subsidiary to the police power.
It is not claimed that municipal legislation touching the streets and sidewalks of a city is not within the proper exercise of the police power. It is claimed, however, that its exercise in this case is so unequal, arbitrary and discriminating as to be a violation of the constitutional rights of the defendant in error, especially his right to the equal protection of the laws.
It is claimed that the classification or exemption made in the proviso denies to the defendant in error the equal protection of the law. Let us examine this classification with a view of a clear definition of it: First. Street obstructions in the city of Xenia áre divided into two classes: 1. Temporary. 2. Permanent. The body of the ordinance clearly applies only to temporary obstructions placed or deposited upon the street, “unless for such reasonable time as may be actually necessary for receiving or discharging the same from some store, building or other place,” etc.
. Second. There is a further classification: 1. Future obstructions. 2. “Obstructions already abutting on any street,” etc.
*448 You cannot have intelligent legislation without intelligent definition, and definition necessarily presupposes classification. In definition we have two propositions involved: first, the genus of the thing defined, and, second, the differentia, or the things by which the particular thing defined is distinguished from other things of its class or group.
In the nature of things, it would be impossible by any single ordinance or statute to include all of the things and persons under all circumstances that it was sought to regulate, hence legislative bodies have been given wide latitude in the exercise of their discretion in making classification of things or persons upon which any given ordinance or statute shall operate.
The subject of classification in the exercise of legislative power has been before this court in a number of cases. In a consideration of the plumber’s act, in State v. Gardner, 58 Ohio St., 599, the act was held unconstitutional because of an unreasonable classification between individuals engaged in the business of plumbing and firms and corporations engaged in the business of plumbing. The individual as such was required to secure a license, but that could be avoided if he became a member of a firm or a corporation, and this court wisely held that that was not the equal protection of the laws. In the third paragraph of the syllabus of that case the court laid down this fundamental doctrine:
“But it is essential to the validity of an act undertaking to regulate the business, that it shall, in its requirements, operate equally.”
*449 The legislative right to classification is further discussed in the case of Gentsch v. State, ex rel. McGorray, 71 Ohio St., 151. The first paragraph of the syllabus reads:
“Classification is often proper and sometimes necessary in legislation, in order to define the objects on which a general law is to take effect and in order to definitely apply and effectuate the purposes of the legislation; but when classification is unnecessary, arbitrary, fictitious or otherwise faultily made and is used to evade the constitutional limitations under the form of general legislation, such legislation in relation to a class may be both special and unconstitutional.1”
In a later case, The Steele, Hopkins & Meredith Co. v. Miller, 92 Ohio St., 115, the same doctrine is discussed in the second proposition of the syllabus:
“A statute is general and uniform, within the requirements of the constitution, if it operates equally upon every person and locality within the circumstances covered by the act, and when a classification has a reasonable basis it is not invalid merely because not made with exactness or because in practice it may result in some'inequality.”
This question has been before the supreme court of the United States more often probably than before any state court, by reason of the 14th Amendment, which directly and expressly guarantees “the equal protection of the laws.” A case most often cited on this doctrine is that of the Central Lumber Co. v. South Dakota, 226 U. S., 157. Justice *450 Holmes in that case lays down the following doctrine, at page 160:
“If the legislature shares the now prevailing belief as to what is public policy and finds that a particular instrument of Nade war is being used against that policy in certain cases., it may direct its law against what it deems the* evil as it actually exists without covering the whole field of possible abuses, and it may do so none the less that the forbidden act does not differ in kind from those that are allowed.”
This doctrine would seem to squarely authorize the city of Xenia to deal against the evil of temporary obstructions by a single ordinance, and leave the subject of permanent obstructions to future legislation, without impairing the ordinance relative to either.
To the same effect, Justice Holmes continues:
“If a class is deemed to present a conspicuous example of what the legislature seeks to prevent, the Fourteenth Amendment allows it to be dealt with although otherwise and merely logically not distinguishable from others not embraced in the law.”
In Middleton v. Texas Power & Light Co., 249 U. S., 152, Mr. Justice Pitney says, at page 157:
“There is a strong presumption that a legislature understands and correctly appreciates the needs of its own people, that its laws are directed to problems made manifest by experience, and that its discriminations are based upon adequate grounds. The equal protection clause does not require that state laws shall cover the entire field of proper legislation in a single enactment. If one entertained the *451 view that the act might as well have been extended to other classes of employment, this would not amount to a constitutional objection.”
In a recent Ohio case, Hall, Supt. of Banks, v. Geiger-Jones Co., 242 U. S., 539, Mr. Justice Mc-Kenna, in discussing the Blue Sky Law of Ohio, which was claimed to be unconstitutional upon the ground of its discriminations amounting to a denial of the equal protection of the laws, said at page 556:
“We cannot give separate attention to the asserted discriminations. It is enough to say that they are within the power of classification which a State has. A State 'may direct its law against what it deems the evil as it actually exists without covering the whole -field of possible abuses, and it may do so none the less that the forbidden act does not differ in kind from those that are allowed.’ ”
He then cites and approves the doctrine announced in Central Lumber Co. v. South Dakota, supra.
This court had before it in a recent case, Yee Bow v. City of Cleveland, 99 Ohio St., 269, this identical question as to classification and exemption, and this court unanimously concurred in the following paragraph of the syllabus:
“When a city has the right, under its police power, to impose regulations upon a business, the validity of an ordinance cannot be attacked merely because its scope was not extended to cover the entire field of possible abuses which such ordinance seeks to prevent.”
The test, derived from the doctrines announced in both federal and state courts relative to classifica *452 tion, is this: Is there a real and substantial distinction in the classification attempted, or is it merely artificial, arbitrary or fictitious, made for the purpose of avoiding constitutional requirements? The classification into things temporary and permanent is of such long standing, and so general in its application to all kinds of conditions and structures that to ask the question is to affirmatively answer it. Legislation for years has recognized this distinction in many departments of activity— the itinerant' or temporary vendor as distinguished from the resident merchant'; the itinerant doctor as distinguished from the resident physician, etc. These classifications, so far as they relate to such substantial distinctions, have always been upheld as within the constitutional provisions. Such has not only been the understanding and application in the courts of law, but likewise in the court of the common people in their daily transactions.
The very context of the body of this ordinance clearly shows that it could have no possible relation or effect upon permanent obstructions, and the proviso would therefore be only so much verbal surplusage. The ordinance, in effect, gives a temporary license “t'o place or deposit * * * upon any street, alley, sidewalk, * ** any wood, coal, box, barrel, crate, * * * for such reasonable time as may be actually necesssiry for receiving or discharging the same from some store, building or other place?”
So that we have here the nature of the deposit, which is free and unattached from the public street, and the temporary use of the street for such pur *453 pose within the rule of reason, and that such deposit is solely for the purpose of transfer; instead of having any reference to a permanent attachment, the context shows that the ordinance is entirely of the contrary nature.
The city of Xenia by this ordinance does not in any wise deal with its permanent obstructions in its streets and public ways. They acquire no right; they are still outlaws and nuisances that may be removed in the usual way and by the usual remedies. This ordinance gives no permanent obstructor any right that he did not have theretofore. Indeed the authorities are numerous and uniform to the effect that a municipality could not, either directly or indirectly, grant any perpetual right in its streets to any abutting owner, or others, for any permanent obstruction whatever. This ordinance simply makes penal the acts of temporary obstructors who do not follow the rule of reason laid down in the ordinance.
We hold that the ordinance does not violate any provision of state or national constitution regarding the equal protection of the laws.

Judgment reversed, and judgment for plaintiff in error.

Jones, Matthias and Robinson, JJ., concur.
Johnson and Hough, JJ., took no part in the consideration or decision of the case.